UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JOHN RANDOLPH TAYLOR                                                  PLAINTIFF

V.                                                      CIVIL ACTION NO. 3:18-CV-234-DPJ-FKB

SMITH & NEPHEW, INC., and
SMITH & NEPHEW, PLC                                            DEFENDANTS

ORDER

This products-liability action is before the Court on Defendant Smith & Nephew, PLC's ("PLC") Motion to Dismiss [30] for lack of personal jurisdiction. Plaintiff John Randolph Taylor seeks jurisdictional discovery. Pl.'s Mot. [37]. For the following reasons, Taylor's motion is denied, and PLC's motion is granted.

I.      Background

On November 7, 2011, Taylor underwent hip-replacement surgery, during which doctors implanted eight Smith & Nephew components. Unfortunately, complications followed, and a second surgery occurred on October 25, 2016, during which doctors replaced three of those components: the R3 Three Hole Hemispherical Stiktite Shell, the R3 XLPE Acetabular Liner, and the Oxinium Modular Femoral Head and Titanium Modular Head Sleeve. Pl.'s Third Am. Compl. [23] ¶ 9. Taylor now says the Smith & Nephew products were defective, causing permanent injuries. He therefore sued two Smith & Nephew companies—PLC and Smith & Nephew Inc. ("INC")—asserting claims for strict products liability and breach of warranty. In response, PLC moved to dismiss for lack of personal jurisdiction. INC does not dispute personal jurisdiction.

II.  PLC's Motion to Dismiss for Lack of Personal Jurisdiction [30]

A.  Standard

"When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the defendant." *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999) (citation omitted). The district court, sitting in diversity, may assert jurisdiction if: (1) the forum state's long-arm statute confers personal jurisdiction, and (2) exercising jurisdiction does not exceed the boundaries of the Fourteenth Amendment's Due Process Clause. *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997). Where the district court rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only make a prima facie case that jurisdiction is proper. *Quick Techs., Inc. v. Sage Grp., PLC*, 313 F.3d 338, 343 (5th Cir. 2002).

"In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including 'affidavits . . . or any combination of the recognized methods of discovery.'" *Id.* at 344 (quoting *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985)). In addition, the Court "must accept as true [the plaintiff's] uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

B.  Analysis

The parties dispute whether specific jurisdiction exists under due-process analysis. The test for that issue includes three elements:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-

related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). Taylor says he can establish these elements because PLC placed the disputed components in the stream of commerce, or alternatively, because PLC is INC's alter ego. Pl.'s Mem. [36] at 10, 12, 18.

        1.        Stream of Commerce

Under the stream-of-commerce test, Taylor must show PLC's contact with Mississippi "stems from a product, sold or manufactured by [PLC], which has caused harm in [Mississippi]" and that PLC "delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in [Mississippi]." *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987); *see also Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (5th Cir. 2013) (holding this circuit continues to apply Justice Brennan's stream-of-commerce theory post-*J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011)). The salient question is whether PLC itself—or one of its subsidiaries—delivered the products into the stream of commerce.

PLC submits three sworn declarations to support its contention that the Court lacks specific jurisdiction over it. Significant to Taylor's stream-of-commerce argument, Susan Swabey, PLC's Company Secretary, avers that "PLC does not manufacture the product, nor did it have any role in its design, labeling, marketing, or sale." Def.'s Mem. [31] at 8 (citing Swabey Decl. [30-1] at ¶¶ 9–11). Consistent with that, INC's Vice-President of Global Marketing, John Clausen, stated in his declaration that "Smith & Nephew, *Inc*. developed, designed, and manufactured the components [at issue] in the United States, with the exception [of one

3

component] manufactured in Tuttlingen, Germany, by Smith & Nephew Orthopaedics Gmbh."
Clausen Decl. [30-2] ¶ 7 (emphasis added).

Taylor, of course, disagrees. And to support his argument, he cites (1) the Smith & Nephew 2017 Annual Report; (2) the 2017 Strategic Report that was part of the Annual Report; (3) screenshots from the Smith & Nephew website; and (4) PLC's social-media accounts. According to Taylor, these exhibits contradict PLC's "self-serving Affidavits" for nine reasons. Pl.'s Mem. [36] at 14. The Court has considered each document and argument to determine whether they contradict PLC's declarations. *Alpine View Co.*, 205 F.3d at 215 (stating court "must accept as true [Taylor's] uncontroverted allegations, and resolve in [his] favor all conflicts between the facts contained in the parties' affidavits and other documentation").

Taylor's first three arguments can be grouped together. First, Taylor says the Annual Report shows significant expenditures in Research and Development ("R&D"). Pl.'s Mem. [36] at 14 (citing Annual Report [35-1] at 14). Thus, according to him, "*PLC* confirms that it 'pays for the development of products like the Device Components involved in [Taylor's] surgery.'" *Id.* (quoting Pl.'s Third Am. Compl. [21-2] ¶ 6 (emphasis added)). Second, Taylor says the Annual Report and website confirm PLC "make[s] or 'has developed a range of primary hip systems,' including 'the R3 Acetabular System.'" Pl.'s Mem. [36] at 11 (quoting Annual Report [35-1] at 19); *see id.* at 15 (citing Website [35-2], [35-3], [35-4]). And third, Taylor asserts that according to the website, "PLC designates the Oxinium, [a] device with which Plaintiff was implanted and which was also ultimately removed[,] . . . as one of its 'Key Products.'" *Id.* (citing Website [35-5]).

The general flaw in these arguments is that Taylor attributes everything in the cited materials to PLC, whereas the materials refer to all Smith & Nephew entities. As PLC explains,

4

references in the reports and the website to "Group or Smith & Nephew . . . mean entities within the Smith & Nephew corporate structure. They are not, as [Taylor] contends, statements that PLC is the corporate entity that manufactured or developed the components at issue here." Def.'s Mem. [42] at 13.[1]

To support its assertion that the materials refer collectively to the Smith & Nephew companies, PLC points first to the Annual Report's "Glossary of Terms," which states that the terms "Group or Smith & Nephew" are "[u]sed for convenience to refer to the Company and its consolidated subsidiaries, unless the context otherwise requires." Annual Report [35-1] at 199. Additionally, the glossary defines "Parent Company" as "Smith & Nephew plc." *Id.* at 200.

As one specific example of that approach and its impact on Taylor's arguments, Taylor cites the R&D expenditures in the Annual Report as proof that "PLC . . . 'pays for the development of products like the Device Components.'" Pl.'s Mem. [36] at 14 (quoting Pl.'s Third Am. Compl. [21-2] at ¶ 6). But the same page of the report addressing these expenses states that they comprise "5% of *Group* revenue." Annual Report [35-1] at 6 (emphasis added). The R&D section of the Annual Report does not—as Taylor says—establish that PLC itself conducted any research.

PLC likewise says that references to "Group or Smith & Nephew" on the website mean the collective corporate structure, not just PLC. Def.'s Mem. [42] at 15. On this point, the website lacks a glossary, which is no surprise. And Taylor correctly notes that the "'About us'" page includes the header: "'Smith & Nephew *plc* what we make.'" Pl.'s Mem. [36] at 4

---

[1] The PLC arguments examined in this section come from its memorandum in opposition to Taylor's motion seeking jurisdictional discovery. *See generally* Def.'s Mem. [42]. In that memorandum, PLC offers a detailed and exhibit-based response to Taylor's arguments, yet Taylor declined to file a reply. Although PLC's unrebutted arguments were compelling, for brevity this Order will highlight representative examples.

5

(quoting Website [35-2] at 2) (emphasis altered). Taylor suggest that this creates a conflict with Swabey's averment that PLC "is a holding company" that "does not produce goods or provide services." Swabey Decl. [30-1] ¶ 4.

Taylor has a superficial point, but it quickly fades with a closer look at the website and the documents it links. To begin, the website never clarifies whether this header references products PLC makes itself verses products manufactured by its subsidiaries. As noted in the Annual Report, PLC is the parent company. Annual Report [35-1] at 200. And elsewhere in the website, it states under the "Hip implants" section, "[o]ur hip implant *franchise* offers a range of special products." Website [35-4] at 4 (emphasis added). So again, the exhibit seems to reference the Smith & Nephew group.

More specifically, PLC says the website confirms Clausen's declaration, Def.'s Mem. [42] at 16, that "Smith & Nephew, *Inc*. developed, designed, and manufactured the Components [at issue] in the United States, with the exception [of one component] manufactured in Tuttlingen, Germany, by Smith & Nephew Orthopaedics Gmbh," Clausen Decl. [30-2] ¶ 7 (emphasis added). PLC is correct. The website links additional information found in brochures produced by INC, not PLC. *See* Brochures [41-1] at Exs. A-2 to A-6. One of those brochures confirms that the "[m]anufacturing facilities" for the R3 Acetabular System are "Smith & Nephew Inc." in the United States, and Smith & Nephew Orthopaedics GmbH in Tuttlingen, Germany, *id.*, Ex. A-6 [41-1] at 14, which is the same thing Clausen stated in his declaration, Clausen Decl. [30-2] ¶ 7.

The web-based materials are likewise consistent with PLC's contention that it had nothing to do with placing OXONIUM into the stream of commerce. Again, the linked brochure identifies Memphis as INC's home, Brochures [41-1], Ex. A-6 at 14, and the Annual Report

6

states that "Memphis is home to the design and manufacturing process of the . . . OXONIUM"), Annual Report [35-1] at 33; *see also id.* (listing PLC's location as London). Thus, the Annual Report, the website, and the attachments to the website all support Clausen's sworn statements that INC, rather than PLC, designed, developed, and manufactured the disputed components.

Turning to Taylor's fourth assertion, he says that PLC placed these products into the stream of commerce "with its own sales representatives . . . or through INC to whom it refers as its 'distributor.'" Pl.'s Mem. [36] at 15 (quoting Website [30-3] at 6; citing Website [35-8], [35-9]). But PLC says Taylor "misquotes the cited web page" and that the "web page's reference to 'distributor[s]' refers to entities located outside of the United States, not [INC]." Def.'s Mem. [42] at 17 (quoting Website [30-3] at 6). PLC is again correct. The website states that PLC has distributors in the countries listed that have a "╪" beside their name. Website [30-3] at 6. And the "United States" does not carry a "╪." *Id.* Ultimately, INC is listed under the "United States" tab, not as a PLC distributor. *Id.* As to Taylor's assertion that PLC used its own sales representatives, he only cites a job-opening list and job description from the website, Website [35-8] and [35-9]; neither support the conclusion that a sales representative employed by PLC placed any components—much less the disputed ones—into the stream of commerce.

Taylor next makes four assertions that PLC directly recruits research and development employees and promotes itself in the United States. Specifically, Taylor says PLC "actively recruits members to its [R&D] team" in a video on the website and on PLC's Twitter page. Pl.'s Mem. [36] at 15. Taylor also argues that PLC "hires for positions in the United States through its Website and Facebook page" and "advertises on LinkedIn that it maintains one of its three (3) office locations in the United States." *Id.* at 16.

Again, PLC offers responses, two of which are most compelling. It first says, "the fact that the Smith & Nephew website posts job listings for various vacancies at various Smith & Nephew entities does not remotely satisfy [Taylor's] burden . . . because the cited materials do not [show] PLC . . . manufactured, developed, or sold the products at issue." Def.'s Mem. [42] at 18. The Court agrees that these exhibits and arguments tend to align more with an alter-ego theory; neither the website-recruitment exhibits, nor Taylor's memorandum, indicate how these job postings show that PLC sold or manufactured a component and placed it into the stream of commerce. *Bearry*, 818 F.2d at 374.

PLC also observes that the website video states that "'Smith & Nephew,' not PLC has '[R&D] facilities in Europe, the Americas, and Asia Pacific.'" Def.'s Mem. [42] at 17 (quoting Def.'s Ex. 8 [41-1] at 1) (emphasis altered). This is true. Neither the webpage nor the video specifically mentions PLC. Instead, they both refer to Smith & Nephew in general. And Taylor offers no other evidence that the R&D program is specific to PLC rather than the collective subsidiaries. Even assuming PLC is involved in R&D, Taylor would have to show that it related to the disputed components, and as to them, the record otherwise establishes that they were developed and manufactured in Memphis and Germany, not at any of PLC's locations.

Lastly, Taylor asserts that "PLC controls all aspects of the marketing, research, and promotion of its products through its global marketing teams." Pl.'s Mem. [36] at 15 (citing Strategic Report [35-7] at 31 (stating "*Smith & Nephew* has three global marketing teams who set the strategic direction of our businesses, guide our [R&D] teams by specifying new products & services needed to reali[z]e those strategies, and develop the promotional assets and guidance to commerciali[z]e our products." (Emphasis added))). But the Strategic Report states at the top of each page that it is part of the "Smith & Nephew Annual Report 2017." *Id.* at 2–49. And as

8

stated before, the Annual Report expressly defines the term 'Smith & Nephew' to encompass the entire group of Smith & Nephew entities, of which PLC is the parent. Annual Report [35-1] at 199.

Based on this record, Taylor has not made a prima facie showing of jurisdiction through a stream-of-commerce theory. The relevant factual averments in Taylor's Third Amended Complaint are controverted and therefore not accepted as true. *Alpine View Co.*, 205 F.3d at 215. As for the parties' record evidence, Taylor has not substantively contradicted PLC's declarations, and he cannot otherwise meet his burden through "surmise and conjecture." *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010).

Put simply, "there is no evidence that [PLC], as distinct from other [Smith & Nephew] entities, sold or manufactured the [disputed components] or otherwise 'delivered the product in to the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state.'" *Id.* (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 380 (5th Cir. 2002)). As discussed more specifically regarding the alter-ego argument, INC's acts will not become PLC's acts just because these separate entities at times present a united front in the Annual Report and web-based materials. For example, in *Freudensprung v. Offshore Tech. Services, Inc.*, the Fifth Circuit held:

> Although Freudensprung insists that WWAI is indistinguishable from Willbros Group, he only offers as evidence various printouts from websites—primarily SEC filings related to all the Willbros entities, which are collectively referred to in these documents as "The Company." While such documents might arguably establish the existence of some corporate relationship between WWAI and the other Willbros entities, they are insufficient to overcome the presumption of corporate separateness. Accordingly, the contacts of Willbros Group and the other Willbros entities with Texas may not be attributed to WWAI in order to subject WWAI to service of process in Texas.

379 F.3d 327, 346–47 (5th Cir. 2004). So too here, Taylor has not established a prima facie showing that PLC itself put the disputed components into the stream of commerce.

2. Alter Ego

Taylor next attempts to make a prima facie showing of personal jurisdiction through an alter-ego theory. Pl.'s Mem. [36] at 18. But Taylor has not addressed the correct test. As PLC observes, this is a diversity case, Def.'s Mem. [42] at 17, so the Court must conduct the alter-ego analysis required by the forum state—*i.e.*, Mississippi, *see Adm.'rs of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x 326, 330 n. 5 (5th Cir. 2011). Taylor ignores this argument and instead applies the federal standards. *See* Pl.'s Mem. [36] at 18–19. And while the two share a few similarities, they are not coterminous.

To begin, both Mississippi and federal law recognize corporate structure and "do not take piercing of the corporate veil lightly." *Nash Plumbing, Inc. v. Shasco Wholesale Supply, Inc.*, 875 So. 2d 1077, 1082 (Miss. 2004) (citation omitted); *see also Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 359 (5th Cir. 2003). Thus, "[c]ourts have long presumed the institutional independence of related corporations . . . when determining if one corporation's contacts with a forum can be the basis of a related corporation's contacts." *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999).

The party seeking to pierce the corporate veil can overcome this presumption by showing that the entities are alter egos. But the state and federal tests for alter-ego status differ. The federal test examines seven factors dealing largely with overlapping leadership and control. *See Hargave v. Fibreboard Corp.*, 710 F.2d 1154, 1161 (5th Cir. 1983). But Mississippi asks whether fraud exists and applies the following three-part test: "(a) some frustration of contractual expectations regarding the party . . . looked [to] for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder."

*Gray v. Edgewater Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989). Taylor never attempts to meet this test, and his arguments fall well short of establishing it. Even assuming some level of overlap, Taylor makes no showing on any of these three elements. For this reason alone, the Court finds that he has not made a prima facie case under the alter-ego theory.[2]

III. Taylor's Motion for Jurisdictional Discovery [37]

A. Standard

When a party seeks jurisdictional discovery, he must first make "a preliminary showing of jurisdiction." *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005). This showing requires "factual allegations that suggest with reasonable particularity the possible existence of the requisite" facts. *Id.* Put simply, "[a] plaintiff is not entitled to jurisdictional discovery when 'the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion'" and the plaintiff is "unable to state how the discovery he requested would change the jurisdictional determination." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 434 (5th Cir. 2014) (quoting *Freeman v. United States*, 556 F.3d 326, 342 (5th Cir. 2009)).

---

[2] Even under the federal standards, Taylor has not made a prima facie showing. Those factors include the following:

> (1) the amount of stock owned by the parent of the subsidiary; (2) whether the two corporations have separate headquarters; (3) whether they share officers and directors; (4) whether they observe corporate formalities; (5) whether they maintain separate accounting systems; (6) whether the parent exercises complete authority over general policy; and (7) whether the subsidiary exercises complete authority over its daily operations).

See *Halton v. CL Med. SARL*, No. 2:14-CV-108-KS-MTP, 2015 WL 5521859, at *6 (S.D. Miss. Sept. 16, 2015) (listing *Hargave* factors). Taylor addresses only some of these considerations, and his evidence fails to satisfy the others for the reasons PLC amply demonstrates in its unrebutted memorandum. *See* Def.'s Mem. [42] at 20–24.

B.  Analysis

Taylor seeks a 90-day jurisdictional-discovery period.  Pl.'s Mem. [38] at 3.  In his supporting memorandum, he outlines the general rules on jurisdictional discovery and incorporates by reference the arguments addressed above regarding PLC's motion to dismiss. *See id.* at 1–3.  His only reference to the discovery he seeks and why it would change the determination states:

> [Talyor's attached] proposed discovery requests seek information related to PLC's contact with the United States and the State of Mississippi; PLC's relationship with and control/authority over its subsidiary and Defendant herein, [INC]; and facts and evidence related to the other factors necessary to demonstrate that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Id.* at 3.

PLC offers a hefty and well supported response, generally arguing that jurisdictional discovery should not be permitted because "none of [Taylor's] exhibits contradicts the declarations submitted with PLC's motion to dismiss," and Taylor "also failed to specify what evidence he believes discovery would produce that would contradict the declarations."  Def.'s Mem. [42] at 8.  Taylor filed no reply and failed to address PLC's authority for denying his motion.

Taylor indeed failed to contradict PLC's declarations.  As stated above, PLC's declarations offer uncontradicted facts that show it did not place the disputed components into the stream of commerce and that PLC is not INC's alter ego.  *See* Swabey Decl. [30-1] ¶¶ 6–11; *see also* Clausen Decl. [30-2] ¶¶ 6–10.  And the documents Taylor references—when read as a whole—actually support PLC's declarations.

On this basis, the Court concludes that Taylor has not made "a preliminary showing of jurisdiction." *Fielding*, 415 F.3d at 429.  And he may not use jurisdictional discovery to go

12

fishing, *see Monkton*, 768 F.3d at 434, something the breadth of his proposed discovery suggests, *see, e.g.*, Pl.'s Int. No. 13 [37-1] (asking PLC to specify every product researched and/or developed by any of its subsidiaries around the world).

Finally, although the Court denies Taylor's motion, it seems apparent that discovery in this case—as in all product-liability cases—will likely include information regarding the development and manufacturing history of the disputed components. Given the sworn declarations, the Court does not expect any link to PLC. But if a link is discovered in the normal course of discovery regarding the disputed products, then Taylor may petition the Court to amend his Complaint.[3]

V.      Conclusion

The Court has considered all arguments raised by the parties; those not addressed would not have changed the outcome. For the reasons stated, PLC's motion to dismiss [30] is granted and Taylor's motion for jurisdictional discovery [37] is denied. The parties shall contact the magistrate judge within seven dates of this Order to set the case for case management conference.

**SO ORDERED AND ADJUDGED** this the 20th day of May, 2019.

s/ *Daniel P. Jordan III*<br>CHIEF UNITED STATES DISTRICT JUDGE

---

[3] To be clear, this is not an invitation to conduct jurisdictional discovery regarding the stream-of-commerce or alter-ego theories. The Court simply anticipates that normal discovery will likely determine where—and by whom—the parts were designed, manufactured, and sold.